United States District Court

For the Northern District of California

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

SEIKO EPSON CORPORATION,

             Plaintiff/Counter-Defendant,

  v.

CORETRONIC CORPORATION and
OPTOMA TECHNOLOGY, INC.,

           Defendants/Counter-Claimants.
_____/

No. C 06-06946 MHP

**OPINION**

**Re: Cross-Motions for Summary Judgment
of Invalidity**

      Plaintiff/counter-defendant Seiko Epson Corporation ("Seiko Epson") brought this action
against defendant/counter-claimant Coretronic Corporation and Optoma Technology, Inc.
(collectively "Coretronic"), alleging infringement of several United States patents, including U.S.
Patent No. 6,203,158 ("the '158 patent") and U.S. Patent No. 6,527,392 ("the '392 patent").
Coretronic counterclaimed, alleging infringement of two United States patents, including U.S. Patent
No. 6,742,899 ("the '899 patent").  Now before the court are the parties' cross-motions for summary
judgment of invalidity of the '158, '392 and '899 patents.  Having considered the parties' arguments
and submissions, and for the reasons set forth below, the court enters the following order.

BACKGROUND

      The patents-in-suit concern projectors.  Projectors may use a high-brightness light source
inside a casing to generate light.  The light is modulated to create images.  High-brightness light
sources generate significant amounts of heat.  Seiko Epson's '158 patent and Coretronic's '899

patent claim improvements to projector designs that increase the effectiveness of projector cooling. Seiko Epson's '392 patent addresses a different problem. It claims a design to ensure the proper alignment of a lamp with the surrounding projector structure so that the images are fully and uniformly illuminated.

I.      Seiko Epson's '158 Patent

The '158 patent was filed on July 29, 1999, as a continuation of U.S. Patent Application 08/943,730, filed on October 3, 1997. See Docket No. 252 (Biber Dec.), Exh. B ("'158 Patent"). The '158 patent issued on March 20, 2001. See id. It describes a design for cooling a projector by using multiple fans and ventilating paths. The specification teaches a design in which external air moves straight into and through the projector's power unit. The other heat-producing components of the projector are cooled via a separate air intake and ventilation path. The power unit is, therefore, cooled by air drawn immediately from the ambient air, rather than air that has already passed near other heat-producing components and thereby retained heat. The design purports to enhance the efficiency of cooling of the power unit.

The asserted claims are claims 1, 2 and 5. Coretronic moves for summary judgment of invalidity on each of these claims. Claims 1 and 5 are independent claims. Claim 1 reads as follows:

> 1.  A projector, comprising:
>
> an optical unit including a light source lamp and a projection lens, the optical unit forming an optical image in response to image information by optically treating light beams emitted from the light source lamp and expansively projecting the optical image through the projection lens;
>
> a power unit including a ventilating path provided inside the power unit for circulating air;
>
> an outer case that stores the optical unit and the power unit;
>
> a first cooling air intake port located on the outer case that provides cooling air from outside of the outer case to the optical unit; and
>
> a second cooling air intake port located on the outer case that directly conducts cooling air from the outside of the outer case to the ventilating path, said second

2

United States District Court

For the Northern District of California

cooling air intake port comprising:

an inlet provided on the power unit, and

a duct connecting said second cooling air intake port and the air inlet.

Id. at 15:25-47.  Independent claim 5 reads as follows:

5.  A projector, comprising:

an optical unit including a light source lamp and a projection lens, the optical unit forming an optical image in response to image information by optically treating light beams emitted from the light source lamp and expansively projecting the optical image through the projection lens;

a power unit including an air inlet and an air outlet;

an outer case that stores the optical unit and the power unit;

a first cooling air intake port located on the outer case that provides cooling air from outside of the outer case to the optical unit;

a second cooling air intake port located on the outer case that directly conducts cooling air from the outside of the outer case to the air inlet; and

an exhaust vent provided on the outer case that directly conducts air exhausted from the air outlet to the outside of the outer case.

Id. at 16:10-31.

Coretronic asserts that the '158 patent is anticipated by both the D-400 projector manufactured by nVIEW ("the D-400") and Japanese Patent Application No. 4-271334 ("Nakamura").  See Baily Dec. (discussing the D-400); Biber Dec., Exh. D ("Nakamura").[1]  The D-400 is a projector, and Nakamura is a patent on a design for cooling a liquid crystal projector that includes multiple fans and air ducts for cooling the projector's power unit and other components.  Nakamura was published on September 28, 1992, before the critical date of the '158 patent.  See id.

II.     Seiko Epson's '392 Patent

The '392 patent was filed on February 25, 1999, and it issued on March 4, 2003.  See Docket No. 251 (Payne Dec.), Exh. B ("'392 Patent").  It describes a design for the mounting of a lamp within a lamp housing in such a way as to properly align the lamp.  The lamp itself comprises a "light source lamp" such as a lightbulb and the larger conical reflector in which the light source

United States District Court

For the Northern District of California

lamp is mounted.  The patent specification describes the manufacturing of the lamp's exterior such that the bottom and the side of the lamp are flat and fit flush against the bottom and side of the lamp housing which surrounds the lamp.  In a preferred embodiment, a firm wireform-type spring presses the lamp down and sideways, as well as forward, against the lamp housing.  In short, the spring holds the lamp in place by pressing it against the surfaces on the lamp housing.

The asserted claims are claims 1, 3, 4, 7, 9 and 10.  Coretronic moves for summary judgment of invalidity on each of these claims.  Claim 1 is the only independent claim asserted, and it reads as follows:

> 1.  A light source lamp unit, comprising:
>
> a light source lamp;
>
> a reflector that reflects light emitted from the light source lamp, the light source lamp being attached to the reflector, the reflector having a main body that reflects light, the main body having and opening on a light-emitting side through which reflected light is transmitted, an outer surface of the light-emitting side of the reflector including a first alignment reference surface that extends in a first direction and a second alignment reference surface that extends in a second direction perpendicular to the first direction;
>
> a lamp housing to which the reflector is mounted, the lamp housing including a first surface extending in the first direction and a second surface extending in the second direction; and
>
> a spring that presses the reflector against the lamp housing so that the first alignment reference surface engages the first surface and the second alignment reference surface engages the second surface.

Id. at 10:15-35.

Coretronic asserts that two pieces of prior art, Seiko Epson's ELP-5000XB projector and U.S. Patent No. 4,660,128 ("Bergin"), each anticipate the '392 patent or render the '392 patent obvious.  The ELP-5000X is a projection device containing a lamp, lamp housing and wireform spring.  It was on sale in the United States before February 25, 1998, the critical date for the '392 patent.  See Huang Dec., Exh. A (Responses to Requests for Admission (RFAs) Nos. 15-17).  Bergin describes a motor vehicle lighting assembly.  Bergin issued on April 21, 1987, before the '392 critical date.  See Payne Dec., Exh. G.

United States District Court

For the Northern District of California

III.   Coretronic's '899 Patent

The '899 patent was filed on April 14, 2003, and it issued on June 1, 2004.  See Docket No. 242 (Keller Dec.), Exh. 2 ("'899 Patent").  It describes a design for the cooling of a lamp holder located inside a lamp casing.  The specification describes a cooling system in which air is moved through ducts located above and below the lamp holder.  By moving air through the ducts, the design allows air which has been heated by contact with the lamp holder to exit the projector, rather than to convect heat from the lamp holder to the outer casing.

The asserted claims are claims 1, 2, 3, 7, 9 and 11.  Seiko Epson moves for summary judgment of invalidity on each of these claims.  The only independent claim is claim 1, which reads as follows:

1.   A cooling apparatus for projector casing, comprising:

a casing having an interior;

a lamp holder fixed in the interior of the casing, and having at least one guiding surface on the side near the lower edge of the lamp holder;

a ventilation outlet disposed on the casing and proximate the side of the lamp holder;

an upper sheet disposed at the top of the lamp holder and keeping a distance from the casing to define an upper air duct;

a lower sheet disposed at the bottom of the lamp holder and keeping a distance from the casing to define a lower air duct; and

a fan disposed adjacent to the lamp holder.

Id. at 4:12-26.

Seiko Epson asserts that three separate pieces of prior art each anticipate the '899 patent: the Optoma EzPro 730 projector; the Epson ELP-3000 projector;[2] and Japanese Patent Publication No. 2000-36215 ("Koba").  Additionally, Seiko Epson asserts that the combination of Japanese Patent Publication Nos. 2000-330206 ("Miyashita") and 2002-49098 ("Kobayashi") renders the '899 claims at issue obvious.

Miyashita describes a system that cools a projector in part by moving air through the spaces between an inner and outer casing.  See Utermohlen Dec., Exh. 2.  Miyashita was published on

United States District Court

For the Northern District of California

1   November 30, 2000, before the '899 patent critical date of April 14, 2002.  See id., Exh. 4 (RFA No.

2   174).  Kobayashi describes a lamp holder for a projector that includes a guiding surface for guiding

3   air beneath the lamp holder.  See id., Exh. 3.  Kobayashi was published on February 15, 2002, before

4   the '899 patent's critical date.  See id.

5

6   IV.   Relevant Procedural History

7         On November 6, 2006, Seiko Epson brought this action against Coretronic.  Coretronic

8   answered and counterclaimed on November 27, 2006.  On March 21, 2007, Coretronic amended its

9   answer and counterclaims, alleging, *inter alia*, infringement of the '899 patent.  On May 16, 2008,

10  the court entered a claim construction memorandum and order.  The parties filed the instant cross-

11  motions for summary judgment on September 28, 2008.  Oral argument was heard on January 22,

12  2009.

13

14  LEGAL STANDARD

15  I.    Summary Judgment

16        Summary judgment may be granted only when, drawing all inferences and resolving all

17  doubts in favor of the non-moving party, there are no genuine issues of material fact and the moving

18  party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); see generally Anderson v.

19  Liberty Lobby, Inc., 477 U.S. 242, 247-255 (1986).  A material fact is "genuine" if the evidence is

20  such that a reasonable jury could return a verdict for the non-moving party.  Anderson at 248.  The

21  moving party bears the burden of identifying those portions of the pleadings, discovery and

22  affidavits that demonstrate the absence of a genuine issue of material fact.  Celotex Corp. v. Catrett,

23  477 U.S. 317, 323 (1986).  Once the moving party meets its initial burden, the non-moving party

24  must go beyond the pleadings and, by its own affidavits or discovery, set forth specific facts

25  showing that there is a genuine issue for trial.  Fed. R. Civ. P. 56(e); see Anderson at 250.

26

27

28

**United States District Court**
For the Northern District of California

II.     <u>Novelty</u>

Novelty of a claimed invention is an explicit condition for patentability.  35 U.S.C. § 102; <u>Aristocrat Tech. Australia Pty., Ltd. v. Int'l Game Tech.</u>, 543 F.3d 657, 660-61 (Fed. Cir. 2008). Section 102(b) provides that a patent claim is invalid if the patented invention is "described in a printed publication in this or a foreign country or in public use or on sale in this country, more than one year prior to the date of the application for patent in the United States."  35 U.S.C. § 102(b); <u>see</u> <u>Schering Corp. v. Geneva Pharm., Inc.</u>, 339 F.3d 1373, 1377 (Fed. Cir. 2003).  A patent claim is invalid based on anticipation if "the four corners of a single, prior art document describe every element of the claimed invention."  <u>Advanced Display Sys., Inc. v. Kent State Univ.</u>, 212 F.3d 1272, 1282 (Fed. Cir. 2000).  Furthermore, such disclosure must be "enabling" in that it must be sufficient to permit a person having ordinary skill in the art to practice the invention.  <u>SmithKline Beecham Corp. v. Apotex Corp.</u>, 403 F.3d 1331, 1342 (Fed. Cir. 2005).  A patent is presumed valid, and the party asserting the affirmative defense of anticipation must prove the facts to establish invalidity of each claim by clear and convincing evidence.  35 U.S.C. § 282; <u>Praxair, Inc. v. ATMI, Inc.</u>, 543 F.3d 1306, 1327 (Fed. Cir. 2008).  "While anticipation is a question of fact, it may be decided on summary judgment if the record reveals no genuine dispute of material fact."  <u>Leggett & Platt, Inc. v. VUTEk, Inc.</u>, 537 F.3d 1349, 1352 (Fed. Cir. 2008) (citation and internal quotations omitted).

III.    <u>Non-Obviousness</u>

35 U.S.C. section 103(a) requires that a patent be non-obvious:

> A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains.  Patentability shall not be negatived by the manner in which the invention was made.

Once the patent issues, each claim in an issued patent is presumed valid.  35 U.S.C. § 282.  As with anticipation, to prevail in invalidating a patent on the basis of obviousness, the moving party must

United States District Court

For the Northern District of California

1    prove obviousness by clear and convincing evidence. <u>Oakley, Inc. v. Sunglass Hut Int'l</u>, 316 F.3d

2    1331, 1339 (Fed. Cir. 2003).

3         The question of obviousness "is a question of law premised on underlying findings of fact."

4    <u>Eolas Techs. Inc. v. Microsoft Corp.</u>, 399 F.3d 1325, 1332 (Fed. Cir. 2005), <u>citing</u> <u>Graham v. John</u>

5    <u>Deere Co.</u>, 383 U.S. 1, 17-18 (1966). These fact questions are: (1) the scope and content of the prior

6    art; (2) the differences between the prior art and the claims at issue; (3) the level of ordinary skill in

7    the art; and (4) secondary evidence of non-obviousness. <u>Graham</u>, 383 U.S. at 17-18; <u>see also</u> <u>KSR</u>

8    <u>Int'l Co. v. Teleflex Inc.</u>, 550 U.S. 398, 406 (2007). The relevant question "is not whether the

9    combination was obvious to the patentee but whether the combination was obvious to a person with

10    ordinary skill in the art." <u>KSR</u>, 550 U.S. at 420.

11         The "combination of familiar elements according to known methods" is likely to be obvious

12    when it "does no more than yield predictable results." <u>KSR</u>, 550 U.S. at 416. If an ordinarily skilled

13    artisan can implement a predictable variation of a work available in the same field of endeavor or a

14    different one, section 103 likely bars patentability of the variation. <u>Id.</u> at 417. If, however, the prior

15    art teaches away from combining certain known elements, discovery of a successful means of

16    combining them is more likely to be non-obvious. <u>Id.</u> at 416. In assessing non-obviousness,

17    hindsight bias and <em>ex post</em> reasoning are to be avoided. <u>Id.</u> at 421; <u>see also</u> <u>Sanofi-Synthelabo v.</u>

18    <u>Apotex, Inc.</u>, 550 F.3d 1075, 1088 (Fed. Cir. 2008) (holding selection and undertaking of the

19    arduous separation of a particular racemate could be judged obvious only with hindsight knowledge

20    that a dextrorotatory enantiomer has certain desirable properties) .

21         To determine the issue of non-obviousness, it will often be necessary for a court "to look to

22    interrelated teachings of multiple patents; the effects of demands known to the design community or

23    present in the marketplace; and the background knowledge possessed by a person having ordinary

24    skill in the art," in order to determine "whether there was an apparent reason to combine the known

25    elements in the fashion claimed by the patent at issue." <u>KSR</u> at 418. To facilitate review, the trial

26    court's analysis should be made explicit. <u>Id.</u> However, the analysis "need not seek out precise

27    teachings directed to the specific subject matter of the challenged claim, for a court can take account

28

8

United States District Court

For the Northern District of California

1    of the inferences and creative steps that a person of ordinary skill in the art would employ." In re

2    Translogic Tech., Inc., 504 F.3d 1249, 1262 (Fed. Cir. 2007), quoting KSR at 418.  "[T]he common

3    sense of those skilled in the art demonstrates why some combinations would have been obvious

4    where others would not."  Leapfrog Enters., Inc. v. Fisher-Price, Inc., 485 F.3d 1157, 1161 (Fed. Cir.

5    2007).

6          Summary judgment is appropriate where the content of the prior art, the scope of the patent

7    claim and the level of ordinary skill in the art are not in material dispute.  KSR at 427.

8

9    DISCUSSION

10   I.    Seiko Epson's '158 Patent

11         Coretronic contends that the asserted claims of the '158 patent are anticipated by, or obvious

12   in light of, the D-400 and Nakamura.  Seiko Epson has asserted two independent claims, claims 1

13   and 5, and a dependent claim, claim 2.

14

15         A.    Prior Art Status of the D-400

16         Seiko Epson challenges the prior art status of the D-400.  Coretronic's expert has examined

17   and opined upon a D-400 projector manufactured after the critical date of the '158 patent, but

18   Coretronic has been unable to produce a D-400 that was on sale before the critical date.  Coretronic

19   therefore seeks to establish that the D-400 examined by its expert is identical to those marketed in

20   the mid-1990s—before the critical date.  To establish such identity, Coretronic relies upon the

21   testimony of one individual, N. Wayne Bailey, a former sales officer for nVIEW, the company that

22   marketed the D-400.  The parties expend not inconsiderable effort in arguing over the appropriate

23   standard for invalidating a patent on the basis of oral testimony.  Hearkening back to the Barbed

24   Wire Patent Case, 143 U.S. 275 (1892), Seiko Epson asserts that corroboration is required of any

25   witness whose testimony alone is asserted to invalidate a patent.  See also Finnigan Corp. v. Int'l

26   Trade Comm'n, 180 F.3d 1354, 1369 (Fed. Cir. 1999).  For its part, Coretronic accuses Seiko Epson

27   of misstating the corroboration standard, arguing that the question is whether Bailey's testimony is

28
                                          9

United States District Court

For the Northern District of California

1  "clear and satisfactory" in light of a multi-factor "rule of reason" test.  See Eibel Process Co. v.

2  Minnesota & Ontario Paper Co., 261 U.S. 45, 60 (1923); Price v. Symsek, 988 F.2d 1187, 1195

3  (Fed. Cir. 1993).

4      It is unlikely that Bailey's declaration would suffice under either standard.  In any event,

5  deciding the status of the D-400 for the purposes of this motion does not call for reliance upon a

6  special corroboration standard.  On summary judgment, Coretronic's burden is at least to show by

7  clear and convincing evidence that there is no genuine issue of material fact regarding the D-400's

8  status as prior art.  Bailey is not held out to be an engineer or to have been involved in the design of

9  the D-400.[3]  He provides no technical documents supporting his assertions.  He is but one witness.

10  The fact that he looked at the interiors of D-400s does not necessarily mean that he understood the

11  technical details of the D-400 or that his memory is sufficiently reliable after more than a decade.

12  Bailey's testimony, standing alone, is insufficient to prove the equivalence of the D-400 produced in

13  2008 to the D-400 models observed in the mid-1990s for the purposes of summary judgment.

14  Accordingly, the D-400 is disregarded.

15

16      B.   Nakamura and Anticipation of Claims 1 and 2

17      The Nakamura patent application was published in 1992, and there is no dispute as to its

18  status as prior art.  Nakamura, which is not listed as a reference on the face of the '158 patent,

19  teaches a projector design with an embodiment containing two separate air inlets and one exhaust

20  vent.  Air drawn into the projector through the first air inlet passes through several projector

21  components before traveling "through the vicinity" of the power supply.  Before this air reaches the

22  power supply, however, it is joined by air pulled into the projector from outside the projector

23  through a second air inlet.  The power supply is then cooled by the combined air from both inlets.

24  Upon passing out of the vicinity of the power supply, at least some of the air passes over or near a

25  light source before exiting the projector through the exhaust vent.  The air is moved via the use of

26  two fans.

27

28                                          10

Claim 1 of the '158 patent requires an optical unit, which Nakamura undisputedly possesses. Claim 1 also has the limitation of a power unit with a "ventilating path provided inside the power unit for circulating cooling air." '158 Patent at 15:33-34. The court ruled in its claim construction order that this limitation is to be construed as "a route in the power unit along which at least some fresh air moves while cooling the power unit, the power unit being a portion of the projector that comprises components that convert and regulate electrical power for use in the projector." Docket No. 183 ("Claim Const. Order") at 24. Nakamura unambiguously discloses a path circulating cooling air through the power unit. See Nakamura at 2 & 10, Figures 2 & 3. Seiko Epson is incorrect in its assertion that the airflow shown in Figures 2 and 3 of Nakamura could just as easily be flowing around the power unit as through it. The patent describes Figures 2 and 3 as different views of the same embodiment. See id. at 8 (¶ 12). Figure 2, a view from above, shows the air path going through the power unit, not around it. Figure 3, a view from the side, shows the air path going both above and through the power unit, not only above or below it. Viewed together, these two schematics of one embodiment show that some or most of the air path is traveling through the power unit, not simply around it. Nothing in the claim language or claim construction suggests that a ventilating path cannot be "inside" a power unit merely because some air passes over or around the unit as well. While some of the language in the patent discloses a more general concept of "traveling in the vicinity of" the power supply, Figures 2 and 3 clearly disclose a specific embodiment in which the air travels through the power unit.

There is no dispute that Nakamura has "an outer case that stores the optical unit and power unit." '158 Patent at 15:35-36. It also plainly has "a first cooling intake port on the outer case that provides cooling air from outside the outer case to the optical unit." Id. at 15:37-39. Furthermore, Nakamura has a second intake port. This intake port "directly conducts cooling air from the outside of the outer case to the ventilation path." Figures 2 and 3 make it plain that the air brought in through the second intake port travels immediately into the power unit. Seiko Epson's suggestion that the air entering from the lower duct, after mixing with the warmer air, might be no cooler than the ambient air, is misplaced. The issue is not whether the air mixture is cooler than the ambient air

(the air outside the outer casing); rather, the question is whether it is cooler than the air *inside* the outer casing of the projector.  See Claim Const. Order at 24.[4]  Since the air already inside the projector is ambient air that has been heated by the process of cooling projector components, any air being brought in from the outside via a second intake port will lower the temperature of the air mixture.  Accordingly, it is "cooling air."  See '158 Patent at 15:4-7 ("Direct introduction of fresh air into the ventilating path permits cooling of the interior of the power unit by fresh air, which is cooler than the air in the outer case . . . .").  Furthermore, an air inlet is inherently disclosed in Nakamura. See Finnigan, 180 F.3d at 1365 (holding that an inherent characteristic must necessarily be present, and so recognized by persons of ordinary skill, in the thing described in the reference).  The passage of air through an ordinary physical object necessitates that some inlet and outlet be present.  Because the air passes through the power unit, there is necessarily "an air inlet provided on the power unit." See '158 Patent at 15:44.[5]  Finally, there is a "duct connecting said second cooling air intake port and the air outlet.  Id. at 15:46-47.  That phrase has been construed to mean a "structure that limits the direction of airflow between the intake port on the outer case and an opening leading to a ventilating path of the power unit so as to form an airflow passage."  Claim Const. Order at 24.  In Nakamura, the airflow is limited by the outer case's structure and duct 41.  Nakamura at 8 & 10. These structures limit the direction of the airflow, directing it toward the power unit.  As such, there is a duct.

In sum, Nakamura reads onto each and every limitation of claim 1.  Accordingly, claim 1 and its dependent claim 2, which merely recites a ventilating fan, are invalid.

C.    Nakamura and Obviousness of Claim 5

Claim 5's limitations are identical to those of claim 1, with three exceptions.  Firstly, claim 5's power unit includes "an air inlet and an air outlet" rather than a "ventilating path."  As noted above, Nakamura discloses air moving through a power unit; therefore, an inlet and outlet for air are inherently disclosed.  Secondly, claim 5 also differs from claim 1 in that the "second cooling air intake port" element recites only an air inlet and no ventilating path or duct.  As discussed,

1    Nakamura discloses an air inlet on a power unit.  Finally, claim 5 claims a final element not recited

2    in claim 1: "an exhaust vent provided on the outer case that directly conducts air exhausted from the

3    air outlet to the outside of the outer case."  There is no material dispute that Nakamura discloses an

4    exhaust vent on the outer case or that the vent exhausts air from the power unit (and its inherent air

5    outlet).  There is a genuine issue of material fact, however, whether Nakamura's exhaust vent

6    "directly" conducts air out of the projector.[6]  Thus Nakamura—the only reference advanced by

7    Coretronic which is clearly prior art—does not disclose as a matter of law the final limitation of

8    claim 5 and does not anticipate the claim.

9         Must Coretronic's motion for summary judgment of obviousness of claim 5 therefore

10   necessarily also fail?  Perhaps conflating novelty and non-obviousness analysis, it is sometimes

11   stated that, for a claim to be held obvious, each and every claim limitation must be identified in the

12   prior art.  A recent post-KSR case took up this issue.  The district court in Abbot Labs. v. Sandoz,

13   Inc., 500 F. Supp. 2d 846 (N.D. Ill. 2007), wrote:

> Prior to the issuance of the KSR opinion, Federal Circuit precedent taught that all the
> claim limitations of the invention at issue must be found to exist in the prior art
> references before it could be determined whether there was a teaching, motivation, or
> suggestion to combine those limitations.  The KSR opinion only focused on the
> Federal Circuit's strict use of the TSM test in performing the obviousness analysis; it
> did not mention or affect the requirement that each and every claim limitation be
> found present in the combination of the prior art references before the analysis
> proceeds.

19   Id. at 851-852 (internal citations omitted).  That court denied an accused infringer of a

20   pharmaceutical patent a stay of injunction pending appeal, finding, *inter alia*, no substantial question

21   of obviousness.  Id. at 853.

22        The district court in Abbot Labs. relied on three pre-KSR cases to support its contention that

23   some version of an "each and every limitation" requirement for obviousness was established in

24   Federal Circuit precedent prior to KSR.  The first such case, Velander v. Garner, 348 F.3d 1359

25   (Fed. Cir. 2003), affirmed a Board of Patent Appeals and Interferences decision that a patent

26   application in the field of bioengineering was obvious.  The court noted in dicta, "If all the elements

27   of an invention are found in a combination of prior art references, a proper analysis under § 103

28

13

United States District Court

For the Northern District of California

1    requires, *inter alia*, consideration of two factors . . . ." Id. at 1363.  In that case, all of the claim

2    limitations had been identified in the prior art, and the question of whether each and every element

3    must exist in prior art references was neither presented nor decided.  The second case relied upon by

4    the district court in Abbot Labs. is U.S. Surgical Corp. v. Ethicon, Inc., 103 F.3d 1554 (Fed. Cir.

5    1997).  In that case, the court affirmed entry of judgment in favor of the accused infringer on the

6    basis of patent invalidity due to obviousness.  The court simply noted that the jury instruction used

7    by the trial court included an instruction that "the prior art must show not only all of the elements of

8    the claimed combination, but must contain some [teaching, etc.] to combine . . . ." Id. at 1564.  The

9    Court of Appeals found no error with the jury's finding of obviousness under such an instruction.

10   The question of whether the instruction stated too rigid a standard was not at issue.  Finally, the

11   district court in Abbot Labs. relied upon Dystar Textilfarben GmbH & Co. Deutschland KG v. C.H.

12   Patrick Co., 464 F.3d 1356 (Fed. Cir. 2006).  Like Velander and U.S. Surgical Corp., the Dystar case

13   affirmed a finding of obviousness.  Focusing on the teaching-suggestion-motivation test, that

14   opinion stated "Where, as here, all claim limitations are found in a number of prior art references,

15   the factfinder must determine what the prior art teaches, whether it teaches away from the claimed

16   invention, and whether it motivates a combination of teachings from different references." Id. at

17   1360 (citation and internal quotations omitted).  Like the other cases, the rule as stated allows a

18   finding of obviousness to be made through a combination of all prior art references and some

19   teaching, suggestion, or motivation to combine; however, neither the holding nor the dicta supports

20   the conclusion that a rigid "each and every limitation" rule stands as a requirement for any finding of

21   obviousness.[7]

22          The Abbot Labs. case was appealed, and the Court of Appeals was presented with this issue.

23   See Abbot Labs. v. Sandoz, 544 F.3d 1341 (2008) (affirming entry, and denying stay, of preliminary

24   injunction).  In that case, one circuit judge appeared to agree, albeit obliquely, with the district

25   court's assertions regarding the requirement that each and every element be present in the prior art.

26   See id. at 1351 (Newman, C.J., concurring).[8]  Another circuit judge strongly disagreed, writing that

27   "a given claim limitation may be obvious over the prior art even if no single reference had

28                                                    14

1    specifically disclosed that limitation."  See id. at 1377 (Gajarsa, C.J., dissenting).  Judge Gajarsa

2    cited cases in support of this conclusion, although the relevant language in these opinions is also

3    dicta.  See Takeda Chem. Indus. v. Alphapharm Pty., Ltd., 492 F.3d 1350, 1356 (Fed. Cir. 2007)

4    ("[S]tructural similarity between claimed and prior art subject matter [structurally similar

5    compounds], proved by combining references *or otherwise*, where the prior art gives a reason or

6    motivation to make the claimed compositions, creates a prima facie case of obviousness.") (citation

7    omitted) (emphasis added); Tegal Corp. v. Tokyo Electron Am., Inc., 257 F.3d 1331, 1349 (Fed. Cir.

8    2001) (stating that district court's finding that the single prior art reference does not disclose "metal

9    wall" claim term does not preclude finding of obviousness of asserted claims).  See also Al-Site

10   Corp. v. VSI Int'l, Inc., 174 F.3d 1308, 1323 (Fed. Cir. 1999) (noting a party asserting invalidity

11   must identify prior art references "which *alone or* combined with other references would have

12   rendered the invention obvious to one of ordinary skill in the art at the time of invention") (citations

13   omitted) (emphasis added); Model Patent Jury Instructions for the Northern District of California

14   (Oct. 9, 2007) § B.4.3b ("This means that . . . a person of ordinary skill in the field . . . who knew

15   about all this prior art would have come up with the claimed invention.").

16        It cannot be said that Federal Circuit precedent establishes that every single claim limitation

17   must be identified in the prior art for a court to invalidate a patent claim on the basis of obviousness.

18   Nor is it apparent that, even if there had been such a rule, KSR left it untouched.  That unanimous

19   Supreme Court decision dealt specifically with the teaching-suggestion-motivation test, but its reach

20   was not explicitly limited to that issue; rather, the opinion set out principles implicating the non-

21   obviousness analysis more generally.  See, e.g., KSR, 550 U.S. at 401 ("Graham provided an

22   expansive and flexible approach to the obviousness question that is inconsistent with the way the

23   Federal Circuit applied its TSM test here.").  This court can discern no rigid "each and every

24   limitation" rule in either the statutory language of section 103 or the flexible test set forth by the

25   Supreme Court in Graham and reaffirmed in KSR.  Accordingly, the fact that the final limitation of

26   the '158 patent's claim 5 is not disclosed in any piece of prior art here in evidence does not mean

27   that the claim necessarily meets the requirement of non-obviousness.

28

United States District Court

For the Northern District of California

Although the specific limitation of "an exhaust vent provided on the outer case that directly conducts air exhausted from the air outlet to the outside of the outer case" has not been identified in the prior art, the scope and content of the prior art and differences between the prior art and the claims at issue, in light of the level of ordinary skill in the art, support a finding of obviousness. Graham, 383 U.S. at 17-18. Nakamura draws ambient air into projectors and circulates and expels such air in order to cool hot projector components. Nakamura 's cooling system uses the same physical components used in the invention claimed by claim 5: two air intake ports, one or more exhaust vents, an outer case, an air outlet and the like. Moreover, the conducting of air from one part of the apparatus to another part, both directly and indirectly, is taught in Nakamura. Like the invention of claim 5, Nakamura teaches the use of multiple ventilating paths with their accompanying ducts and vents to cool a single projector. Claim 5 does not claim the specific spatial arrangement within the casing, i.e., specifically that given elements are nestled next to each other or are a certain shape or distance apart. The invention claimed by claim 5 is the arrangement of the cooling airways such that one airway goes directly through the power unit, with the purpose of more efficiently cooling it. See '158 Patent at 15:1-7.

There are a limited number of components requiring cooling inside a projector casing, and such a casing can contain only so many prior art air passageways. Where, as here, there is a finite number of identified, predictable solutions, success is likely the product not of innovation but ordinary skill and common sense. KSR, 550 U.S. at 421.[9] Seeking to increase the efficiency of cooling a power unit by arranging a prior art design with air ducts such that an air duct goes directly through the power unit is obvious under the "obvious to try" rationale approved by the Supreme Court and the Federal Circuit. See In re Kubin, 561 F.3d 1351, 1359 (Fed. Cir. 2009) (explaining permissible and impermissible applications of the "obvious to try" rationale).[10] Dedicating an airway to the power unit would have been obvious, and Seiko Epson has not offered evidence that the prior art teaches away from such an arrangement.[11] Nor has Seiko Epson presented any evidence of secondary considerations that would support non-obviousness, e.g., commercial success, long felt but unsolved needs, or the failure of others. KSR, 550 U.S. at 406; Graham, 383 U.S. at 17-18; see

16

also <u>Muniauction, Inc. v. Thomson Corp.</u>, 532 F.3d 1318, 1327 (Fed. Cir. 2008).  In sum, there is no genuine issue of material fact contradicting the conclusion that a person ordinarily skilled in the art, when confronted with the problem of more efficiently cooling the power unit, would at the time of invention have considered arranging a duct like those taught by Nakamura to directly cool the power unit and to directly exhaust the air from the power unit out of the casing.  The differences between claim 5 and Nakamura are, as a matter of law, "such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains."  <u>See</u> 35 U.S.C. § 103.  In light of Nakamura, claim 5 is obvious as a matter of law.

II.       Seiko Epson's '392 Patent

Coretronic argues that the asserted claims of the '392 patent are anticipated by both the Bergin patent and Seiko Epson's ELP-5000XB projector or, alternatively, are obvious.  Seiko Epson does not dispute Coretronic's contention that both of these are prior art.  Instead, Seiko Epson argues that neither piece of prior art practices the invention, because (1) Bergin does not disclose a spring or alignment reference surfaces; and (2) the ELP-5000XB's reflector is not pressed and does not engage the accompanying lamp housing laterally.  Seiko Epson also argues that Coretronic has not proven obviousness, because Coretronic's expert does not indicate how the two references would be combined or what would motivate a person of ordinary skill in the art to combine the references.

A.       <u>Anticipation</u>

Bergin discloses a headlight assembly for use in an automobile.  Like the ELP-5000XB, Bergin discloses wireform springs (two separate ones in the preferred embodiment) to press a lamp reflector against a lamp housing.  <u>See</u> Payne Dec., Ex. G at 9:52-10:34.  Bergin's wireform springs also press the reflector forward, toward the center of the aperture, rather than to one side.  <u>See id.</u> The relevant difference between Bergin and the ELP-5000XB is that Bergin discloses an external, projecting flange member having a plurality of protuberances around the front of the reflector.  <u>See</u>

17

United States District Court

For the Northern District of California

id. at 6:59-68.  These protuberances line up with corresponding bosses located around the sides of the front of the lamp holder.  See id. at 6:68-7:2.  Coretronic asserts that each protuberance has a first and a second alignment surface that align with the corresponding boss.  By engaging each protuberance with its respective boss, the wireform spring or springs align the alignment surfaces as required by claim 1, according to Coretronic.  In this interpretation, there is not just one first reference surface and one second reference surface; rather, there are as many first and second reference surfaces as there are protuberances.  Similarly, each boss possesses a first surface going in one direction and a second surface going in another.

Coretronic's theory for finding that Bergin meets the claim limitation requiring a first and second reference surface hinges upon, among other things, the notion that the reflector's protuberances are somehow inserted into the bosses on the lamp holder.  This could be the case if Bergin's "bosses" were in fact depressions of some sort, such that the reflector's protuberances fit within the depressions.  Yet even Coretronic's own expert appears to recognize that a "boss" is "something that juts out," rather than a depression.  See Docket No. 340, Exh. B (Payne Depo.) at 150; see also Random House College Dictionary (1982) (defining "boss" as a "protuberance" or a "stud").  Coretronic's theory appears to be, however, that the bosses, while themselves protuberances, each contain a cavity within them into which the reflector's protuberances fit.  This theory is without merit, because the patent teaches no such cavities.  While it might make apparent sense to align protuberances with cavities, the fact remains that Bergin does not disclose such a system.  Indeed, it appears that the purpose of the protuberances and bosses may not have been to themselves physically align the lamp but rather to provide "aiming pads" allowing a manufacturer to determine the alignment and connect the reflector and the lamp housing in some other fashion.  See Bergin at 7:31-37.  Bergin does not anticipate the claims.

The ELP-5000XB is a projector practicing almost all of the limitations of claim 1 of the '392 patent.  For instance, the ELP-5000XB has a lamp assembly consisting of a light source lamp and a reflector.  The reflector is held in place within a lamp housing by a wireform spring.  Seiko Epson argues that the ELP-5000XB cannot anticipate claim 1 because it does not practice the limitation of

18

United States District Court

For the Northern District of California

1  "a spring that presses the reflector against the lamp housing so that the first alignment reference

2  surface engages the first surface and the second alignment reference surface engages the second

3  surface."  Specifically, Seiko Epson contends that the reflector does not exert a lateral force against

4  the side of the lamp housing.  According to Seiko Epson, the wireform spring supplies only

5  downward pressure to the ELP-5000XB's reflector, pressing said reflector in one direction, rather

6  than along two reference surfaces extending in two different directions.

7         Indeed, Coretronic has provided no evidence that the ELP-5000XB's wireform spring exerts

8  pressure in a direction other than the downward direction.[12]  Coretronic instead argues that claim 1

9  does not contain a specific "lateral force" limitation.[13]  While this observation is, strictly speaking,

10  correct, the claim does specify that the reflector is engaged in two different directions.  As

11  demonstrated by Coretronic's own evidence, the ELP-5000XB's spring aligns the reflector in the

12  center of the aperture, rather than against a side of the lamp housing.  See Payne Dec., Exh. C.[14]

13  However, there is no material dispute that the ELP-5000XB practices the other limitations of the

14  claim.

15

16         B.      Non-Obviousness

17         Coretronic urges that the '329 patent claims are, if not anticipated, obvious.  "The

18  combination of familiar elements according to known methods is likely to be obvious when it does

19  no more than yield predictable results."  KSR, 550 U.S. at 416.  Indeed, the prior art ELP-5000XB

20  contains every element of the '392 patent, except for the "presses the reflector against the lamp

21  housing so that the first alignment reference surface engages the first surface and the second

22  alignment reference surface engages the second surface" limitation.  Engaging an object against two

23  parallel surfaces to hold it in place is neither novel nor non-obvious.  The bricks of the Great

24  Pyramid at Giza were aligned by engaging multiple perpendicular surfaces of each brick against the

25  surfaces of surrounding bricks.  A floor tile inset into a floor is aligned along two surfaces with

26  neighboring tiles to press it into the correct position.  Common experience is replete with examples

27  of the pressing of surfaces of one object against the surfaces of another to hold the object in place.

28

United States District Court

For the Northern District of California

1       A claim is less likely to be obvious if the prior art teaches away from combining the claimed

2   elements. KSR, 550 U.S. at 416.  If, for instance, the prior art had taught that pressing the reflector

3   against the housing should be avoided due to some obstacle that technique posed—perhaps such a

4   design might make reflectors more vulnerable to damage caused by impacts, for instance—then a

5   technique for overcoming the obstacle and thereby allowing improved alignment would be non-

6   obvious.  But that is not this patent.  The '329 patent does not teach how to overcome any existing

7   obstacle to pressing the reflector against the housing.  Instead, it claims a design the simply presses a

8   reflector against a housing.  Seiko has presented no evidence that the prior art teaches away from a

9   design in which the reflector is pressed against the sides of its housing.

10      Moreover, there are only so many ways to secure a reflector within a lamp housing.  See

11  KSR, 550 U.S. at 421.  An ordinarily skilled artisan in this field is "one with a Bachelor's degree in

12  physics, engineering, optics or other related field who also is familiar with the design of projectors."

13  Claim Const. Order at 5.  It is clear as a matter of law that an ordinarily skilled artisan using

14  common sense would consider adjusting her prior art wireform spring to press the reflector against

15  the surfaces of the housing.[15]  There was also an apparent reason to combine the known elements in

16  the fashion claimed by the '392 patent.  See KSR, 550 U.S. at 418.  The patent itself states that prior

17  art projectors required accurate positioning in relation to the optical axis to efficiently use their

18  luminous flux.  '392 Patent at 1:30-36.  The court's non-obviousness analysis "need not seek out

19  precise teachings directed to the specific subject matter of the challenged claim, for a court can take

20  account of the inferences and creative steps that a person of ordinary skill in the art would employ."

21  Id.  An ordinarily skilled artisan in this field would have been motivated to optimize the alignment

22  of reflector and lamp housing and would have taken the step of modifying the reflector to press it up

23  against the sides of the housing for stability.  Finally, it must be noted that Seiko Epson has not

24  offered any evidence regarding secondary considerations.  See KSR, 550 U.S. at 406; Graham, 383

25  U.S. at 17-18.  Claim 1 of the '392 patent is obvious as a matter of law.  Dependent claims 3, 4, 7, 9

26  and 10 each recite some non-novel variant of claim 1 and are likewise invalid.

27

28
                                                    20

**United States District Court**
For the Northern District of California

III.     Coretronic's '899 Patent

Seiko Epson has pointed to five pieces of prior art that, it argues, either anticipate the asserted claims of the '899 patent or render them obvious.  None of these references were considered by the U.S. Patent and Trademark Office (USPTO) during the initial examination of the patent. Seiko Epson has also moved for a declaration that the '899 patent is unenforceable due to Coretronic's failure to disclose its Optoma EzPro 730 projector to the USPTO during examination. In light of the following discussion, it is unnecessary to reach the merits of the anticipation or inequitable conduct arguments.

Seiko Epson contends that the combination of Miyashita and Kobayashi renders the '899 claims at issue obvious to a person having ordinary skill in the art.  Miyashita describes a system in which an image display device casing is provided with both an inner and outer structure.  One way in which the device is cooled is through the transmission of heat from the inner casing into coupling members that transfer heat to specific locations on the outer casing.  A second way in which the device is cooled is through the movement of air by a fan through the "space between the first casing . . . and the second casing."  Utermohlen Dec., Exh. 2 ("Miyashita") at 1.  The lamp is cooled by outside air flowing between the inner casing and the outer casing.  Air is clearly shown flowing through the spaces bounded by the upper and lower surfaces of the inner lamp casing and the respective parts of the outer casing to which they are coupled.  See id. at Figure 1.

Every element of the '899 patent's claim 1, save one, can be found in Miyashita.  The casing disclosed in Miyashita has an interior.  There is a ventilation outlet on the casing and proximate to the side of the lamp assembly.  The top and bottom of the inner casing define an upper air duct using an upper sheet and a lower air duct using a lower sheet.  There is a fan located adjacent to the lamp holder.  The missing element is "a lamp holder fixed in the interior of the casing, and having at least one guiding surface on one side near the lower edge of the lamp holder."  '899 Patent at 4:14-16. While something must hold the lamp in position, Miyashita does not describe in detail any sort of lamp holder.

United States District Court

For the Northern District of California

1    Kobayashi teaches this other element.  It discloses a removable lamp holder.  The lamp is

2    cooled by air blown through a passage created between the cover of the aperture and a diagonal

3    surface, a guide rib present in the bottom of the lamp holder.  "[A]n air passage . . . is formed

4    between the cover and the lamp holder so as to guide cooling air . . . ."  Utermohlen Dec., Exh. 3

5    ("Kobayashi") at 6.  In short, Kobayashi discloses a lamp holder with a guiding surface near the

6    lower edge of the lamp holder.

7    Accordingly, each of claim 1's elements is identifiable in the prior art.  Moreover, an

8    ordinarily skilled artisan would be expected to consider the step of augmenting Miyashita with

9    Kobayashi's guiding surface or surfaces.  Guiding surfaces have often been used in cooling ducts to

10   smooth out airflow (making it more laminar versus turbulent), reduce backpressure and provide for

11   more controlled and efficient cooling.  See Keller Dec. ¶ 16.[16]  Anyone faced with designing an air

12   duct must, by the very nature of the activity, consider how to position surfaces so as to direct air

13   toward the desired target.[17]  Both parties have alluded in their papers to market incentives to create

14   projectors that dissipate heat more efficiently and effectively.  Indeed, the broad range of prior art in

15   evidence shows that many inventors have sought to do just that.  Furthermore, Coretronic has

16   presented no evidence that the prior art taught away from the modification of the Miyashita design

17   with a lamp holder having leading surfaces.  A skilled artisan, when faced with the demand for more

18   efficient cooling, would without a doubt have considered such a modification.

19   Seiko Epson has clearly and convincingly established a prima facie case that claim 1 is

20   obvious as a matter of law.  Coretronic has not attempted to rebut this showing with evidence of

21   secondary considerations.  Instead, Coretronic argues that the combination of Miyashita and

22   Kobayashi cannot render the '899 patent obvious because neither of these patents was directed

23   toward the problem of cooling an outer casing.  Precisely this sort of argument was addressed and

24   rejected by the Court in KSR: "The second error of the Court of Appeals lay in its assumption that

25   person of ordinary skill attempting to solve a problem will be led only to those elements of prior art

26   designed to solve the same problem."  KSR at 420.  As the Court noted, common sense teaches that

27   "familiar items may have obvious uses beyond their primary purposes."  Id.  Whether or not the

28

22

prior art in question was expressly directed toward cooling the outer casing cannot control the result here.[18]

Claim 1 is invalid as a matter of law, and the '899 patent's dependent claims do not fare any better. Claims 2, 3 and 9 merely address the position of the lower sheet and represent no engineering innovation. Claims 7 and 11 are likewise minor variations of claim 1. This patent's purported innovation hinges on claim 1. Each of the challenged claims is invalid under section 103(a) as a matter of law.

CONCLUSION

For the reasons stated above, the court rules as follows. Defendants/counter-claimants' motion to invalidate claims 1 and 2 of the '158 patent is GRANTED on the basis of anticipation. Defendants/counter-claimants' motion to invalidate claim 5 of the '158 patent is GRANTED on the basis of obviousness. Defendants/counter-claimants' motion to invalidate claims 1, 3, 4, 7, 9 and 10 of the '392 patent is GRANTED on the basis of obviousness. Plaintiff/counter-defendant's motion to invalidate claims 1, 2, 3, 7, 9 and 11 of the '899 patent is GRANTED on the basis of obviousness.

IT IS SO ORDERED.

Dated: May 15, 2009

_____
MARILYN HALL PATEL
United States District Court Judge
Northern District of California

United States District Court
For the Northern District of California

23

**ENDNOTES**

1.      Neither party has questioned the accuracy of any of the certified translations filed in connection with these motions.

2.      Coretronic's Rule 56(f) motion to continue the hearing on Seiko Epson's motion for summary judgment, Docket No. 287, is DENIED as moot.  The hearing on the cross-motions for summary judgment has already occurred, and this decision does not rely upon assertions of the ELP-3000 projector's status as prior art.

3.      There has been no showing that determining specifications or finalizing marketing requirements, see Bailey Dec. ¶ 5, is the same as active participation in the design of the technology itself.

4.      The parties jointly requested clarification of the court's construction of "directly conducts cooling air" as "transmits cooling air without *reducing* its temperature to that of the air inside the outer casing of the projector."  See Docket No. 198 (Joint Request for Clarification); Docket No. 183 (Claim Const. Order).  The parties are correct that use of the word "reducing" was in error and that the correct word is "increasing."

5.      The location and nature of the inlet required by claim 1 of the '158 patent is described in only general terms in the specification.  See '158 Patent at 14:57-67; 5:32-38.

6.      On the one hand, as Seiko Epson's expert points out, text references in Nakamura describe air passing "through the vicinity" of the power supply and then the light source, cooling both of them before being exhausted.  See Nakamura at 7-8 (¶¶ 10 & 13).  This suggests that the air does not "directly" exit the projector casing after cooling the power supply.  On the other hand, the drawings illustrating embodiments of the invention show an air path with some air passing from the power unit over or near the light source and some air passing in a direct line from the power unit to the exhaust vent.  See id., Figures 2 & 3.  The figures, at least, suggest that some air may pass directly out of the projector without cooling the light source.

7.      Indeed, the tenor of these (pre-KSR) opinions suggests that where all elements had been identified in various prior art references, there was an *additional* requirement: a teaching, suggestion or motivation to combine.  Where, on the other hand, obviousness was based on one piece of prior art, there was no need to identify a specific motivation to combine, since nothing was being combined.

        Regarding claim 5, obviousness is apparent because the claim is an obvious extension of, or variant upon, Nakamura.  The motivation to make such a variant is inherent to the nature of the goal expressly sought by the '158 patent and by the prior art: to achieve efficient cooling of projectors and their components.

8.      Judge Newman wrote for a majority comprising herself and Judge Archer; however, Judge Archer did not join in Part I of the opinion, in which Judge Newman took up this issue.  Judge Gajarsa dissented.

9.      Designing configurations of familiar mechanical projector components does not involve the same level of unpredictability as, for example, the chemical arts.  Cf. Eisai Co. Ltd. v. Dr. Reddy's Labs., Ltd., 533 F.3d 1353, 1359 (Fed. Cir. 2008).

10.     It is impermissible to invalidate a claim under an "obvious to try" rationale where what was "obvious to try" was either (1) "to vary all parameters or try each of numerous possible choices until one possibly arrived at a successful result, where the prior art gave either no indication of which parameters were critical or no direction as to which of many possible choices is likely to be successful" or (2) "to explore a new technology or general approach that seemed to be a promising field of

24

experimentation, where the prior art gave only general guidance as to the particular form of the claimed invention or how to achieve it."   Kubin, 561 F.3d at 1359.

11.    It should also be noted that the final claim limitation of claim 5 "solves no stated problem and would be an obvious matter of design choice within the skill of the art." Application of Kuhle, 526 F.2d 553, 555 (C.C.P.A. 1975).  The specification makes a number of references to the benefits of cooling air being conducted directly from an intake port to cool the hot projector components. See, e.g., '158 Patent at 3:3-6; 13:19-22; 15:1-7.  However, the patent contains no reference to any advantage to directly conducting air exhausted from the air outlet to outside the outer case, as opposed to using it to cool other components.

12.    Coretronic did point to its expert's opinion that a component of the lamp assembly which the expert calls a "sheet metal spring" exerts lateral pressure on the lamp.  In its opposition, Seiko Epson responded by explaining, quite plausibly, that the item identified by Coretronic's expert as a "sheet metal spring" did not exert lateral force, as it was actually one of four metal strips used to secure a glass cover over the lamp's aperture.  See Iechika Dec. ¶¶ 3-6 & Exhs. A-D.  Coretronic did not dispute this explanation in its reply, thus conceding the point.

13.    It may be noted that Coretronic opines, in its reply, that the springs in the ELP-5000XB lamp assembly are *almost* identical" to those in the ELP-7300, a device that Coretronic asserts to have been admitted by Seiko Epson to be a commercial embodiment of the '392 patent.  This being the case, the ELP-5000XB must *ipso facto* practice the invention, according to Coretronic.  Apparently, counsel for Coretronic is unfamiliar with the old adage (doubtlessly coined by a judge): "'Almost' only counts in horseshoes and hand grenades."

14.    The wireform spring appears to push the reflector both downward and foreword toward the aperture.  Coretronic has not argued that the lamp housing against which the front of the reflector is being pressed (in the direction of the aperture) should be considered one of the two alignment reference surfaces, perhaps because it does not "align" the reflector in any real sense.

15.    It would also be well within the capability of the ordinarily skilled artisan to alter the surfaces of the reflector as needed to press them firmly against the sides of the housing.
       Claim 1 quite clearly represents something that is "obvious to try" in the sense of the term approved by the Supreme Court and the Federal Circuit.  See Kubin, 561 F.3d at 1359.

16.    Coretronic did not rebut this testimony of Seiko Epson's expert.

17.    To state it another way, Coretronic has not shown that the combination of these elements yields anything "more than one would expect from such an arrangement." See Sundance, Inc. v. Merlot Tarpaulin & Sidekit Mfg. Co., Inc., 550 F.3d 1356, 2008 U.S. App. LEXIS 26082 (Fed. Cir. Dec. 24, 2008), at *30, quoting Sakraida v. AG Pro, Inc., 425 U.S. 273, 282 (1976).  The benefit of using a guiding surface to guide air within a projector would have been inescapably obvious to an ordinarily skilled artisan.

18.    Coretronic also points out that Seiko Epson's expert used a definition of a person of ordinary skill in the art that differs slightly from that adopted by the court in claim construction, in developing his opinion.  The difference is insubstantial and does not affect the result here.